595 So.2d 943 (1992)
James F. COY, M.D., et al., Petitioners,
v.
FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION PLAN, et al., Respondents.
No. 76565.
Supreme Court of Florida.
February 13, 1992.
Rehearing Denied April 22, 1992.
*944 Donna H. Stinson of Moyle, Flanigan, Katz, Fitzgerald & Sheehan, West Palm Beach, and Kent Masterson Brown, Lexington, Ky., for petitioners.
Wilbur E. Brewton and J. Riley Davis of Taylor, Brion, Buker & Greene, Tallahassee, and Robert A. Butterworth, Atty. Gen. and George L. Waas, Asst. Atty. Gen., Tallahassee, for respondents.
Thomas J. Maida and Patricia H. Malono of McConnaughhay, Roland, Maida, Cherr & McCranie, P.A., Tallahassee, amicus curiae for Drs. J. Thomas Atkins, Max Sugar, John A. Tirpak and Marvin A. Perer.
William H. Adams, III and Robert J. Winicki of Mahoney, Adams & Criser, P.A., Jacksonville, and John E. Thrasher, Gen. Counsel of Florida Medical Ass'n, amicus curiae for Drs. James T. McGibony, Joseph Von Thron, Mark D. Ziffer and William Barfield.
PER CURIAM.
We have for review McGibony v. Florida Birth-Related Neurological Injury Compensation Plan, 564 So.2d 177 (Fla. 1st DCA 1990), which expressly declared section 766.314, Florida Statutes (1989), to be valid. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
Several physicians practicing in areas other than obstetrics filed this action against the Florida Birth-Related Neurological Injury Compensation Plan (the Plan), an entity created as part of the medical malpractice reforms enacted in 1988. See chs. 88-1 & 88-277, Laws of Fla. (codified at §§ 766.301-.316 (Supp. 1988)). Essentially, the Plan administers a no-fault system to insure against certain types of neurological injuries suffered by infants at birth. However, obstetricians are not required to join the Plan, and insurance thus is available only if the obstetrician has elected to join. Those who join pay an annual assessment of at least $5000. § 766.314(4)(c), Fla. Stat. (1989).
To further fund the Plan, the statute imposes on all licensed physicians, not merely obstetricians, a mandatory annual assessment of $250. § 766.314(4)(b), Fla. Stat. (1989). Although not at issue in this case, licensed hospitals also are assessed $50 per infant delivered. § 766.314(4)(a), Fla. Stat. (1989). These amounts can be increased by action of the Plan whenever it finds that the Plan cannot otherwise be maintained on an "actuarially sound" basis, subject to oversight by the Department of Insurance. § 766.314(5), (7), Fla. Stat. (1989).
The physicians who brought this cause argued that the assessments against them are unconstitutional because they derive no benefit from it greater than does the general public. They note that they have been singled out to pay a large part of the cost while the general public pays nothing. The evidence at trial indicated that 27,922 physicians *945 paid the $250 assessment for 1989, while only 535 obstetricians elected to join the Plan. (Approximately 17,000 other physicians failed to pay the 1989 assessments.) The physicians argued that the link between the tax and its benefits was too tenuous to meet constitutional standards.
The trial court and the First District Court of Appeal rejected all these claims. The court below held that the Plan does not violate due process or equal protection, is not an impermissible delegation of legislative authority, and meets the standards for tax statutes established in Eastern Air Lines, Inc. v. Department of Revenue, 455 So.2d 311 (Fla. 1984), appeal dismissed, 474 U.S. 892, 106 S.Ct. 213, 88 L.Ed.2d 214 (1985). McGibony, 564 So.2d at 179-80.
Initially, we find that the $250 assessment in this case constitutes a "tax" within the meaning of Florida law. In the past, we have defined a tax as an enforced pecuniary burden laid on individuals or property to support government. State ex rel. Clark v. Henderson, 137 Fla. 666, 188 So. 351 (1939). Here, the $250 assessment is levied upon physicians to support a governmental enterprise, i.e., a state-created system for compensating certain individuals for certain types of birth-related injuries. The assessment is collected under authority of state law, and the Plan can sue to enforce the assessment. § 766.314(6)(b)1, Fla. Stat. (1989). It thus is a tax and is subject to the requirements of law applicable to taxes.
In the Eastern Air Lines case, this Court established the following test for gauging the validity of a taxing statute:
When the state legislature, acting within the scope of its authority, undertakes to exert the taxing power, every presumption in favor of the validity of its action is indulged. Only clear and demonstrated usurpation of power will authorize judicial interference with legislative action. In the field of taxation particularly, the legislature possesses great freedom in classification. The burden is on the one attacking the legislative enactment to negate every conceivable basis which might support it. The state must, of course, proceed upon a rational basis and may not resort to a classification that is palpably arbitrary. A statute that discriminates in favor of a certain class is not arbitrary if the discrimination is founded upon a reasonable distinction or difference in state policy.
Eastern Air Lines, 455 So.2d at 314 (citations omitted). Obviously, this test provides the "rational basis" standard for weighing claims that a tax statute violates equal protection. See art. I, § 2, Fla. Const.
We find that the rational basis test applies in the present case, as opposed to the strict-scrutiny standard, because physicians are not a "suspect" class within the meaning of the equal protection provision of the Florida Constitution. Id. A "suspect class" is any group that has been the traditional target of irrational, unfair, and unlawful discrimination. DeAyala v. Florida Farm Bureau Casualty Ins. Co., 543 So.2d 204, 206 (Fla. 1989); Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249, 251 (Fla. 1987). Physicians do not meet this definition, and the applicable standard thus is the "rational basis" test described in Eastern Air Lines.
Applying this test to the facts at hand, we conclude that there is a rational basis for the statutory assessment of all physicians even though they do not practice obstetrics. In upholding the constitutionality of the statute, the trial judge made the following comprehensive findings of fact:
The Plan bears a reasonable relationship to its stated purposes, by insuring the availability of obstetrical care to Florida citizens and by providing for the care of Florida children who suffer birth-related neurological injuries, and Plaintiffs bear a reasonable relationship to the Plan. As documented and reported by the Academic Task Force, physicians play a critical role in the delivery of health care services and all physicians were adversely affected by the medical malpractice crisis which engulfed this *946 state and severely disrupted the delivery of health care services and the day-to-day operations of hospitals throughout the state.
The Defendant's witness, Mr. Jay Weinstein, an expert in hospital administration, provided unrefuted testimony regarding the extent and effects of the disruption in the delivery of health care services. See Transcript of final hearing, pages 71-79, 81-85.
For example, various critical services including emergency room, trauma, obstetrical, and neurosurgery were reduced or eliminated and, consequently, remaining services were overloaded. Referrals among physicians were reduced and hospitals found it difficult to recruit and maintain staff. Access to major health care services was limited and, as a result, the relationship between the public and the medical profession deteriorated.
The effects of the disruption of obstetrical services are particularly severe. When those services are not provided, the emergency room staff is overloaded and "the system is pushed to the wall." Negative economic consequences befall the hospital as well, since mothers are a primary source of patient referrals for physicians in all specialties.
The devastating effects of the disruption in the delivery of obstetrical services were confirmed even by Plaintiffs' expert, Dr. Masterson, who, during questioning, testified:
Question: "Hypothetically, let's assume for a moment that all of the obstetrical physicians on that staff, because of malpractice premiums and because of  frankly, because of the problems associated with malpractice, including having to come to the courthouse and testify, and so forth, decided they had had enough. And they had decided that they have had enough so much that they decided to stop either treating indigent patients, which are sometimes a common problem pregnancy, or otherwise just stop practicing OB. Based on that hypothetical I gave you and your small knowledge of Jackson, would that have an effect on that hospital's operations?"
Answer: "It would be disastrous."
Question: "That disaster would permeate that hospital; wouldn't it?"
Answer: "I presume, yes."

See Transcript of final hearing, page 35.
Additionally, hospitals which do not provide obstetrical services are also negatively impacted by the crisis as they struggle to refer their patients to other, unfamiliar facilities.
Conversely, when the malpractice crisis is lessened and health care services can be delivered smoothly and efficiently, benefits will be seen and felt throughout the health care industry.
For example, access to health care services will be expanded as services which were eliminated or reduced during the crisis are again offered. Emergency rooms and trauma centers will re-open. Patient referrals will increase and physicians will be able to practice in pleasant and full service facilities. Essentially, the negative consequences of the malpractice crisis will be alleviated.
In light of these facts, Plaintiffs' claim that they are not related to the goals of this Plan cannot be sustained. Health care services are delivered by a team of providers, all of whom interact and depend on one another. The malpractice crisis severely disrupted the delivery of health care services and all members of the "team" suffered. Since one of the goals of the Plan is to help alleviate the crisis and permit the efficient delivery of health care services by all members of the team, Plaintiffs are undeniably related to at least one of the goals of the Plan and stand to benefit from its realization. This act is not a cure all, but will be a major contribution to the cure. Thus, the Legislature's decision to require Plaintiffs to contribute to the Plan was not wholly unreasonable, arbitrary, or capricious.
There is competent substantial evidence to support these findings. All doctors rely on efficiently operated hospitals. The record is clear that when there is an unavailability *947 of obstetrical services, the operations of hospitals are seriously disrupted. Emergency rooms are overtaxed and nonspecialists are put in a position of having to treat the patients. Because health care services are delivered by a team of providers, all of whom interact and depend upon one another, a breakdown in one area of service impacts the other areas. Moreover, without an adequate number of obstetricians, the ability of other physicians to refer their patients is adversely affected.
Sections 766.301-.316, Florida Statutes (1989), seek to ensure the availability of obstetrical services. We are convinced that all physicians, regardless of whether they practice obstetrics, derive a benefit from this legislation that is greater in degree than that derived by the general public. While the benefits accruing to nonobstetrical physicians are obviously less than those obtained by obstetricians, the legislature recognized this by assessing them only $250 as compared to $5000.
We also do not believe that the statute at issue constitutes an impermissible delegation of legislative authority to tax to the Department of Insurance. Section 766.314(7)(b), Florida Statutes (1989), reads as follows:
(b) If the Department of Insurance finds that the plan cannot be maintained on an actuarially sound basis based on the assessments and appropriations listed in subsections (4) and (5), the department shall increase the assessments specified in subsection (4) on a proportional basis as needed.
The reference to "actuarially sound basis" obviously refers to the consideration of whether the assets and projected income of the Plan will be sufficient to meet the anticipated claims against it. In passing on the constitutionality of the Florida Patients Compensation Fund, this Court in Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815, 819 (Fla. 1983), stated:
The district court found the statute to be almost totally absent of guidelines and standards for the establishment of fees and assessments. The opinion cited six provisions which were deemed invalid for giving "sole discretion" to the Fund in the absence of sufficient guidelines. The first provision held to be constitutionally infirm is the provision which directs that base fees for health maintenance organizations, ambulatory surgical centers and other medical facilities (as defined by § 768.54(1)(c)) are to be "established by the fund on an actuarially sound basis." The district court stated that this part of the statute left to the Fund sole discretion for establishing the amount of fees. We do not agree.... The courts of Florida have found concepts of actuarial soundness to be a meaningful standard. McNulty v. Blackburn, 42 So.2d 445, 447 (Fla. 1949). The Florida Constitution employs the standard of "sound actuarial basis." Art. X, § 14, Fla. Const. These principles are also incorporated in other statutes. §§ 627.062(2)(a) & 627.0651(2), Fla. Stat. (Supp. 1982). There is simply no merit to this argument.
Southeast Volusia cannot be meaningfully distinguished. The fact that the Florida Patients Compensation Fund statute established a ceiling on the amount of money the compensation program could have on hand had nothing to do with the determination of whether the concept of actuarial soundness was a meaningful standard. Likewise, such specific criteria for the charging of fees which may have been included in that statute were totally unrelated to the question of what was meant by actuarial soundness.
Further, we reject the contention that the amendment to section 766.314 contained in chapter 89-186, Laws of Florida, means that the amount of any additional assessments is to be determined by the Florida Birth-Related Neurological Injury Compensation Association rather than the Department of Insurance. Section 766.314(2) provides that the association shall submit to the Department of Insurance for review a plan of operation which includes provisions for the assessment of the physicians. The plan of operation and any amendments to the plan are subject to the *948 approval of the Department of Insurance. Section 766.314(5)(a) provides that "the association shall determine the amount of additional assessments necessary pursuant to subsection (7), in the manner required by the plan of operation, subject to any increase determined to be necessary by the Department of Insurance pursuant to paragraph (7)(b)." Section 766.314(7)(b) clearly places the decision concerning the need for an increase upon the Department of Insurance. We interpret the statute as requiring the Department of Insurance to authorize any increased assessment. See Miami Dolphins Ltd. v. Metropolitan Dade County, 394 So.2d 981 (Fla. 1981) (statute shall not be stricken as an unconstitutional delegation of powers where it is susceptible to a constitutional interpretation).
Finally, we do not find the statute to be in violation of the Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution. Under section 766.314(4)(b), all physicians licensed under chapters 458 and 459, Florida Statutes (1989), except obstetricians, are subject to an equal assessment of $250. The assessment has no relationship to the residence of the licensee. The assessment is upon the privilege of holding a license to practice medicine in this state. The fact that a nonresident may receive less benefit from the assessment is simply a result of the decision to live outside the state of Florida.
The remaining attacks against the statute are without merit and need not be discussed. We hold that section 766.314 is constitutionally valid and approve the decision below.
It is so ordered.
OVERTON, McDONALD, GRIMES and HARDING, JJ., concur.
KOGAN, J., concurs in part and dissents in part with an opinion, in which SHAW, C.J., and BARKETT, J., concur.
KOGAN, Justice, concurring in part, dissenting in part.
I concur in the majority's conclusion that this case is governed by the rational basis test and that physicians are not a "suspect class" within the meaning of the equal protection clause of the Florida Constitution. I dissent as to the application of the rational basis test in this case.
In the present case, the state has enacted a program designed in principle to benefit the public as a whole, but that effectively benefits only obstetricians who elect to join the plan and those persons who suffer losses caused by certain birth-related injuries attributable to the member-obstetricians. While this is a laudable purpose, I can find no rational basis for imposing much of the burden of this program primarily on physicians as a class, including those who do not practice obstetrics and have no connection whatsoever with the delivery of babies. I think this particularly is true in light of the fact that obstetricians are not obliged to join the plan, and many have exercised this option.
To my way of thinking, this type of "status tax"  one based exclusively on a person's station in life or membership in a particular group  cannot pass even the relaxed standards of the rational basis test unless there is some logical and reasonable nexus between the status of the taxpayer and the purpose the tax is intended to achieve. Art. I, § 2, Fla. Const. There are obvious reasons for this requirement.
It is a truism that the power to tax is the power to destroy. While this phrase is so often repeated as to be cliche, I find nothing trite in the suggestion that the legislature can tax a person's status without proper reasons. Such a precedent would make equal protection an illusory right. In the present case, the legislature has sought to tax primarily physicians to pay for insurance against certain birth-related injuries. This is little different from taxing only schoolteachers to pay for new educational facilities, or taxing only licensed psychologists to pay for public mental-health care, or taxing only policemen to pay for victims' compensation programs.
One step further along this doubtful train of logic would lead to the conclusion that society can shift its more onerous tax *949 burdens exclusively onto those minorities or groups that lack a sufficient voice in the state capitol. Political expedience might encourage this practice, since legislators could raise revenue without imposing an unpopular general tax. While I recognize that some inequities in taxation are inevitable and tolerable under the Florida Constitution, the guarantees of the Declaration of Rights clearly will not tolerate the gross inequity apparent in the present case.
Equal protection means that similarly situated people are treated similarly by the law and that, at a minimum, irrational distinctions may not be drawn. This guarantee was violated by the statute in question, and to that extent I believe the statute should not be allowed to stand.
In reaching these conclusions, I do not imply that a status tax is always unconstitutional under article I, section 2 of the Florida Constitution. For example, in Department of Insurance v. Southeast Volusia Hospital District, 438 So.2d 815 (Fla. 1983), this Court confronted a case in which a medical malpractice compensation fund was financed through assessments levied only against its members in exchange for a form of malpractice insurance. All health care providers could elect to join, and all hospitals were required to join unless they could demonstrate financial responsibility. Hospitals, health maintenance organizations, and similar organizations  but not individual health-care providers  also were subject to increased assessments.
This Court upheld the increased, mandatory assessments against hospitals that could not demonstrate financial responsibility, because they stood in a different position than other health-care providers. Obviously, hospitals are large enterprises that dispense the bulk of the most important and demanding medical care available in our society. The legislature rationally could conclude, first, that hospitals unable to demonstrate financial responsibility must have some form of malpractice insurance so that the public will be protected; second, that no similar requirement need be imposed on other health-care providers such as physicians and dentists; and, third, that the brunt of the cost of this insurance should fall on the hospitals themselves. Although this is a status tax, the status of the taxpayer is rationally related to the purpose of the tax and therefore is constitutional. Art. I, § 2, Fla. Const.
The Southeast Volusia case thus involved a situation vastly different from the facts at hand, contrary to the majority's assertion. Here, all physicians are forced to bear a substantial part of the cost of a program that provides no direct benefit whatsoever to the vast majority of their number. In Southeast Volusia, every member of the compensation plan clearly received a quid pro quo: By joining or being forced to join, they were guaranteed a form of malpractice insurance. No such quid pro quo exists in the present case, nor is the assessment otherwise rationally related to the activities or status of the group singled out to be taxed.[1]
Thus, I would quash the opinion below, hold the relevant statutes unconstitutional, and remand to the trial court to determine whether and to what extent refunds are owed to petitioners under the principles announced in McKesson Corp. v. Division of Alcoholic Beverages & Tobacco, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), and any other applicable law or precedent.
SHAW, C.J., and BARKETT, J., concur.
NOTES
[1] Of course, a status tax against physicians would be permissible if it helped finance the state's efforts to regulate the practice of medicine.