# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D2020-3605

_____

SHANDS JACKSONVILLE MEDICAL
CENTER, INC., and UNIVERSITY
OF FLORIDA BOARD OF
TRUSTEES,

    Appellants,

    v.

JENNIFER CHAVEZ and MARLON
CHAVEZ as Parents and Natural
Guardians of G.C., a Minor
Child, and FLORIDA BIRTH-
RELATED NEUROLOGICAL INJURY
COMPENSATION ASSOCIATION,

    Appellees.

_____

On appeal from the Division of Administrative Hearings.
Todd P. Resavage, Administrative Law Judge.


August 7, 2025


OPINION ON MOTIONS FOR REHEARING, REHEARING EN BANC,
CERTIFICATION OF CONFLICT, CERTIFICATION OF A QUESTION OF
GREAT PUBLIC IMPORTANCE, AND CLARIFICATION

PER CURIAM.

    We deny the pending motions for rehearing, rehearing en banc, certification of conflict, certification of a question of great public importance, and clarification. On our own motion, we

withdraw our opinion issued December 11, 2024, and substitute the following in its place.[*]

Upon reconsideration of Appellants' notice of voluntary dismissal filed on March 27, 2023, the Court dismisses this proceeding. *See* Fla. R. App. P. 9.350(b); Fla. R. App. 9.330(e) (noting that the rule authorizing the filing of rehearing and other post-decision motions "is not meant to limit the court's inherent authority to reconsider nonfinal appellate orders and decisions").

DISMISSED.

ROBERTS and NORDBY, JJ., concur; TANENBAUM, J., concurs in result only with opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

TANENBAUM, J., concurring in result only.

The new majority in this case has decided that it is better to dismiss based on the appellants' request (made, by their own admission, in the face of what counsel gleaned from oral argument to be an imminent loss), rather than on this court's assessment of whether its authority to review administrative action has been properly invoked. Of course, it is a dismissal just the same—a refusal to afford relief or to give judicial imprimatur to the administrative order that was to be reviewed. Because the disposition has not changed, I concur. But as explained in the original majority opinion, this court's appellate judicial power cannot be invoked by an intervenor to review administrative action unless that intervenor can demonstrate the action will cause it cognizable harm. That is, unlike an appeal from a trial court's final

_____

[*] Judge Roberts was substituted for an original panel member in this proceeding after the initial opinion issued.

order—which may be taken as a matter of constitutional right—there necessarily is a standing requirement to obtain judicial review of administrative action, whether that review is authorized in the circuit court or the district court of appeal. Below I explain why the appellants lack standing, warranting dismissal for lack of jurisdiction.

I

The Florida Constitution is clear that the State's sovereign powers must be kept separate unless otherwise provided. *See* Art. II, § 3, Fla. Const. (providing that, unless the constitution otherwise specifies, "[n]o person belonging to one branch shall exercise any powers appertaining to either of the other branches"). It seems, though, that the line separating the executive power and the judicial power sometimes becomes blurred when it comes to adjudicating disputed facts on which the administration of a government program depends. Case in point is the administrative regime that has developed around the Florida legislative plan for compensating birth-related neurological injuries, which the appellants vigorously defend. That regime, in operation, threatens to diminish both the constitutionally vested power of the judicial branch and an individual's constitutional right to access Florida's courts for the redress of injury. I hope to highlight this danger by bringing into finer focus the important distinction between the scope and reach of the judicial power (as exercised by the trial courts) and that of the quasi-judicial power (as exercised from within the executive branch). Before I do, let me set the stage.

On one side of the divide is the executive power, charged with administering policies adopted by the Legislature—a responsibility that can include management of government programs designed to provide public benefits to citizens. Entitlement to one of those benefits sometimes will turn on qualifying facts in dispute, which the executive branch (if directed by the Legislature) can adjudicate through a legislative grant of *quasi*-judicial power, yet only to the extent necessary to perform the function of administering the government benefit. An executive-branch hearing officer resembling a judge might take evidence and make an adjudication as part of that government function, but make no mistake: the officer remains a functionary

3

of the executive branch (read: one of the two political branches), and as such, can issue orders that hold sway only *within the branch*, and only so far as necessary to determine a claim to a public right. Simply put, the executive branch—again, if directed by the Legislature—can conclusively adjudicate, *internally*, disputed facts as between an agency or officer of the State and its citizens regarding the administration of public benefits that turn on those facts.

The judicial power lies on the other side of the divide. This is the only sovereign power that can *conclusively* decide disputes over *personal* rights between *private* parties. That power extends to adjudicating facts the law specifies as necessary to decide such disputes, and then applying the law to those facts in order to render a judgment either that permanently alters the parties' legal relationship or that defines the rights and obligations between them. The judgment (subject to review by a superior court) is final and has the force of law as to those parties, making it subject to execution without further adjudication—its effects being felt beyond the branch; indeed, being felt throughout the State. The judicial branch's nature as non-political allows it to serve a function vital to the preservation of liberty: the neutral, dispassionate interpretation and application of law in the conclusive determination of both private disputes between parties and legal challenges by citizens to instances of unlawful government overreach. This is the essence of judicial power, which may be exercised only by the judicial branch and cannot be delegated.

Before the court, ostensibly, is a final order of an administrative law judge ("ALJ") concluding that parents Jennifer and Marlon Chavez are not entitled to compensation out of the Florida Birth-Related Neurological Injury Compensation Plan (the "Plan") because their daughter did not sustain a "birth-related neurological injury" ("BRNI"), as that type of injury is defined by section 766.302(2), Florida Statutes (2017).[1] The Chavezes, though, are not the appellants here. In fact, the Chavezes

---

[1] All statutory references are to Florida Statutes (2017) unless otherwise noted.

specifically have *disclaimed* any such entitlement. The appellants in this case—Shands Jacksonville Medical Center, Inc. ("Shands"), and the University of Florida Board of Trustees ("UF")—instead were the *intervenors* before the ALJ, but also the healthcare providers the Chavezes presumably would want to sue in a Florida circuit court.

Shands and UF, though permitted to intervene without objection, did not have an independent statutory right to invoke the ALJ's quasi-judicial authority. There was no government function to be performed under the Plan for their benefit—no "claim" to a government benefit established in their favor. Even though by law these intervenors themselves could not have asserted a claim for compensation on behalf of the Chavezes or their child; and even though there was no claim pending with DOAH—they nevertheless took over and pushed forward with the matter, asserting that the infant *did* suffer a BRNI and presented evidence to that effect—asking the ALJ to determine that the Chavezes *were* entitled to compensation, despite the Chavezes' disclaimer to the contrary. Shands and UF essentially sought administrative adjudication of what they otherwise would assert as an exclusive-remedy affirmative defense in a future medical malpractice suit brought by the Chavezes—presumably in an effort to foreclose that suit before it happens using an executive branch order.

This is problematic—quite troubling, in fact, from a separation of powers perspective. Whether the Chavezes would be entitled under the Florida Constitution to sue for medical malpractice in circuit court turns on the nature of the infant's injury. If the injury is a BRNI, the court would lack authority to proceed on such a suit—making such a factual determination one of jurisdictional import, one that only the circuit court could determine *conclusively* for itself. Because Shands and UF do not have their own claim to a government benefit—one against which the ALJ's order might have some binding effect—the only way they could claim that the ALJ's order impinges on their rights is by arguing that the administrative order could have some preclusive effect on a trial court's exercise of its vested judicial power.

5

This is what the Florida Constitution plainly forbids. Despite their being allowed to move the administrative proceeding forward independently (absent a compensation claim by the Chavezes), Shands and UF cannot show they have suffered any cognizable harm from the ALJ's final order on the matter. If they did not have a claim to a government benefit to begin with, the ALJ's order puts them in no worse position than they were before the Chavezes initiated the proceeding. This is not an appeal from a trial court's final order, so Shands and UF must show they have standing to seek review of the ALJ's order. This they cannot do.

II

In recognition of the high costs associated with BRNI claims, the Legislature established "a limited system of compensation irrespective of fault" by creating the "Plan" to financially cover "a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation." §§ 766.301(1)(d), (2), 766.303(1), (2), Fla. Stat. (2019). Since 2021, a board of directors, appointed by the State's Chief Financial Officer and operating as an association (loosely called "NICA"), is expressly directed to administer the Plan "in a manner that promotes and protects the health and best interests of children with birth-related neurological injuries [BRNI]," which the Legislature defines in terms of a "brain or spinal cord" injury to a baby of a specified minimum weight, "caused by oxygen deprivation or mechanical injury" that occurs during "labor, delivery, or resuscitation," that leaves the baby "permanently and substantially mentally and physically impaired." §§ 766.302(2), 766.303(4), 766.315(1)(a), Fla. Stat. (2021).

The Plan essentially is a risk-management or insurance trust fund. The Legislature funds the Plan through budgetary appropriations plus assessments (read: taxes) on licensed hospitals and physicians. *See* § 766.314(1), (4), (5)(b), (c), (7), Fla. Stat.; *see also Coy v. Fla. Birth-Related Neurological Injury Comp. Plan*, 595 So. 2d 943, 944 (Fla. 1992). NICA adopts an operational plan, subject to approval by the Department of Financial Services, that provides for "assessments on an actuarially sound basis," subject to certain limitations. § 766.314(2)(a)4., Fla. Stat. The funds are to be used exclusively for the payment of "awards" made

6

from the Plan and for expenses incurred to administer it. *Id.* (2)(a), (3), Fla. Stat.; *see also* § 766.303(1), Fla. Stat. ("There is established the Florida Birth-Related Neurological Injury Compensation Plan for the purpose of providing compensation, irrespective of fault, for birth-related neurological injury claims."). Naturally, the funds under the Plan are state funds, and the Legislature waives sovereign immunity "solely to the extent necessary to assure payment of compensation" for BRNIs. §§ 766.303(3), 766.315(5)(f), 766.31(1), Fla. Stat. NICA administers "the payment of claims on behalf of the plan" and can "[t]ake such legal action as may be necessary to avoid payment of improper claims." § 766.315(4)(c), (j), Fla. Stat.

The whole point of the Plan is to facilitate—in lieu of a judicial proceeding—no-fault, yet exclusive, compensation from state funds *for the benefit of those children* claimed by their legal representatives to have suffered a BRNI. § 766.301(2), Fla. Stat. ("It is the intent of the Legislature to provide compensation, on a no-fault basis, for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation. This plan shall apply only to birth-related neurological injuries."). Indeed, "[t]he rights and remedies" under the Plan regarding a BRNI are exclusive of "all other rights and remedies . . . against any person or entity directly involved" that arise out of or relate to medical negligence, except in some limited circumstances. § 766.303(2), Fla. Stat.; *see also* § 766.304, Fla. Stat. (precluding a recipient of compensation under the Plan from bringing civil suit).

The Legislature taps the Division of Administrative Hearings ("DOAH")—part of the Department of Management Services in the executive branch—to administer these "claims" against the Plan's funds, which is done through its ALJs, appointed hearing officers. § 766.304, Fla. Stat.; *see also* § 766.302(4), (5), Fla. Stat. (defining "administrative law judge" and "division"); *cf.* § 766.312, Fla. Stat. (requiring aid of judicial branch for enforcement of ALJ orders).[2] As just noted, this regime is in place for parents and others acting

---

[2] ALJs used to be called "administrative hearing officers" in the Florida Statutes. The limited executive authority is the same regardless, and these titles are used herein interchangeably.

on behalf of injured infants who have a good faith belief that their children have suffered BRNIs at the hands of treating physicians and hospital personnel immediately before, during, or after childbirth. Parents who genuinely believe their child has suffered a BRNI *must* seek compensation under the Plan, through the executive branch. To be clear, it is they (or another legal representative of the infant) as claimants who put this executive-branch regime into motion, "claimant" being defined as "any person who files a claim pursuant to s. 766.305 *for compensation*." § 766.302(3), Fla. Stat. (emphasis supplied).

The claimant files that claim "under the plan" by "filing with [DOAH] a petition *seeking compensation*." § 766.305(1), Fla. Stat. (emphasis supplied); *cf. id.* (3)(c) (requiring claimant to submit "[d]ocumentation of expenses and services incurred to date which identifies any payment made"). DOAH then provides the petition to NICA, and *NICA* (not the healthcare provider) must respond to the claim. *Id.* (2), (4). If NICA determines the claim to be compensable, it may accept it for compensation, provided the ALJ assigned to the petition approves that acceptance. *Id.* (7). If NICA does not accept the claim, or the ALJ does not approve NICA's acceptance, the ALJ will "hear and determine" the claim, using "the full power and authority granted to her or him in chapter 120"—the formal, statutory dispute at all times being between NICA and the claimant. § 766.304, Fla. Stat.

The ALJ must make several "determinations based upon all available evidence," starting with whether "the injury claimed" in fact meets the definition of a BRNI, but also whether "obstetrical services" were provided by or under the supervision of a physician who had paid an assessment into the Plan (or was exempted) for the year in which the BRNI occurred. § 766.309(1), Fla. Stat.; *see also* § 766.302(7), Fla. Stat. (defining "participating physician"). If the ALJ determines that the claim is compensable—essentially, that the evidence shows that the injury suffered meets the definition of a BRNI—that is the end of it, and the ALJ "make[s] an award providing compensation" for various specified past and future expenses out of the Plan's funds. § 766.31(1), Fla. Stat.; *see also id.* (2) ("The award shall require the immediate payment of expenses previously incurred and shall require that future expenses be paid as incurred."); § 766.309(1)(c), Fla. Stat.

(requiring ALJ to determine how much compensation is awardable under section 766.31, Florida Statutes).[3] If, however, the ALJ determines that the claim is not compensable, the determination has no legal effect outside the executive branch. *See* § 766.304, Fla. Stat. ("If it is determined that a claim filed under this act is not compensable, neither the doctrine of collateral estoppel nor res judicata shall prohibit the claimant from pursuing any and all civil remedies available under common law and statutory law. The findings of fact and conclusions of law of the administrative law judge shall not be admissible in any subsequent proceeding. . . ."). Judicial review of an order of the ALJ determining compensability of the filed claim is to be by appeal to a district court of appeal. *See* § 766.311(1), Fla. Stat.; *see also* Art. V, § 4(b)(2), Fla. Const. ("District courts of appeal shall have the power of direct review of administrative action, as prescribed by general law.").

## III

### A

In this case, G.C. was born at Shands. G.C. suffered a brain injury due to oxygen deprivation around the time of her birth, and she later was diagnosed with severe cerebral palsy. The parents, on their own and on behalf of G.C., originally petitioned for compensation under the Plan. The petition prayed for the award of payment for medical services and expenses for G.C. as provided

---

[3] The ALJ may also have to adjudicate whether the providers complied with the notice requirement set out in section 766.316, Florida Statutes—if the claimant contests the exclusivity of the award once the claim is determined to be compensable. *See* § 766.309(1)(d), Fla. Stat.; *Fla. Birth-Related Neurological Injury Comp. Ass'n v. Fla. Div. of Admin. Hearings*, 948 So. 2d 705, 711 (Fla. 2007) ("*NICA v. DOAH*") (explaining that proper pre-delivery notice "is a condition precedent to NICA's exclusivity" (citing *Galen of Fla., Inc. v. Braniff*, 696 So. 2d 308, 309–10 (Fla. 1997))); *see also McDonald v. Fla. Birth-Related Neurological Injury Comp. Ass'n*, 396 So. 3d 891, 903 (Fla. 1st DCA 2024) (Tanenbaum, J., dissenting) (addressing how the ALJ's statutory authority to address the fact question of notice arises only if the claim has been adjudicated compensable).

by statute for a BRNI. NICA investigated the claim and obtained medical reviews by two physicians, one whom opined that that G.C. did "not fulfill criteria of a substantial mental impairment." Based on the reviews, NICA denied that the Chavezes' claim was compensable because G.C.'s injury did meet the definition of a BRNI. *See* § 766.305(4), Fla. Stat. (giving NICA forty-five days to respond to a petition for compensation). Shands, which employed the nursing and support staff involved in G.C.'s delivery, sought to intervene. UF, which employed the physician involved, sought to intervene as well. The Chavezes did not object, and the ALJ allowed both interventions. These two provider-intervenors jointly asserted, based on their review of the medical records, that the Chavezes' claim *was* compensable.

Thereafter, the Chavezes filed an amended petition in diametric opposition to—in fact, disclaiming—the original one. They indicated that their new petition was being filed "under protest" because they felt they could not constitutionally be compelled to file such a petition as a prerequisite to bringing a civil suit. The Chavezes went so far as to essentially disavow any claim to the Plan's funds at all. They asserted that they "are not 'claimants,'" and in reliance on the medical reviews obtained by NICA, the Chavezes took a new position: that G.C.'s "case . . . does not meet the definition of a NICA compensable claim for reasons outlined by the NICA experts in their reports." Their amended petition's prayer asked for the opposite of the original relief they sought, asking for the ALJ to determine G.C.'s injuries to be "non-compensable" under the Plan.[4]

The case proceeded to a final hearing on certain stipulated facts; a stipulated record full of exhibits and deposition testimony; and closing arguments. There was no live testimony presented. Each of the parties then submitted a proposed final order. The ALJ entered his final order, effectively confirming the Chavezes' modified position and determining G.C. had not suffered a BRNI that was compensable under the Plan. The Chavezes do not

[4] NICA later changed its position, agreeing with Shands and UF that G.C.'s injury was a BRNI that could support compensability under the Plan.

10

challenge that determination; but intervenors Shands and UF do, now seeking judicial review in this court.

B

After briefing closed, a previously constituted panel questioned this court's jurisdiction to engage in the direct review requested by Shands and UF. *See W. 132 Feet, etc. v. City of Orlando*, 86 So. 197, 198–99 (Fla. 1920) ("Courts are bound to take notice of the limits of their authority, and if want of jurisdiction appears at any stage of the proceeding, original or appellate, the court should notice the defect and enter an appropriate order."); *see also Polk County v. Sofka*, 702 So. 2d 1243, 1245 (Fla. 1997) (noting that "the limits of a court's jurisdiction are of primary concern, requiring the court to address the issue sua sponte when any doubt exists" (internal quotations and citation omitted)). The concern stemmed from the Chavezes' about-face reflected in their amended petition. Whatever the reason, the Chavezes, in their amended petition, expressly disavowed any status as "claimant" and any entitlement to benefits from the Plan. That is, they declared in their DOAH case that they no longer were pursuing a claim for compensation against the Plan, effectively taking a voluntary dismissal of their "claim." Absent a claim, there was no authority for the ALJ to issue an order on compensability. *See* § 766.304, Fla. Stat. ("The administrative law judge shall hear and determine all claims filed pursuant to ss. 766.301-766.316 . . . ."); *Fla. Birth-Related Neurological Injury Comp. Ass'n v. McKaughan*, 668 So. 2d 974, 978 (Fla. 1996) (observing that this specific "statutory language [in section 766.304, Florida Statutes,] clearly limits the jurisdiction of the hearing officer to determining the nature of an infant's injury *only* when a claim for benefits under section 766.305(1) is filed alleging that the infant *has* suffered a NICA injury" (first emphasis supplied)).

The parties responded to the court's invitation to submit supplemental briefing on the jurisdictional question.[5] Shands and UF acknowledge that the Chavezes are not "claimants" against the Plan, and that neither NICA nor a healthcare provider may initiate a proceeding regarding compensation under NICA. *Cf.*

---

[5] The question was further addressed on rehearing.

11

§ 766.302(3), Fla. Stat. (defining "claimant" in terms of filing "a claim pursuant to s. 766.305 for compensation for a [BRNI]" and allowing such a claim to be filed on behalf of the infant "by any legal representative"); § 766.305(1), Fla. Stat. (requiring commencement of a claim for compensation under the Plan by the claimant's filing of a "petition seeking compensation"); *see also McKaughan*, 668 So. 2d at 977–78 (noting that "[c]ommon sense dictates that claims for NICA benefits would be filed only by a legal representative of the injured infant who is *affirmatively* seeking such benefits" (emphasis supplied)); *Bennett v. St. Vincent's Med. Ctr., Inc.*, 71 So. 3d 828, 844 (Fla. 2011) (holding that whether an individual is a "claimant" turns on "whether the person is seeking compensation under the NICA Plan"). Both Shands and UF, though, rely on what they admit is "an odd interpretation" of the statute, to argue that a parent, even if not a claimant, must seek "an ALJ determination on compensability before pursuing or continuing" a civil suit.

Similarly, NICA asserts that the jurisdictional question "was conclusively addressed and resolved by the Legislature in 1998" with the enactment of chapter 98-113, Laws of Florida, which NICA claims amended the Plan's statutory provisions in response to *Florida Birth-Related Neurological Injury Compensation Association v. McKaughan*. The law added a sentence to section 766.301(1)(d), Florida Statutes, that provided: "The issue of whether [BRNI] claims are covered by this act must be determined exclusively in an administrative proceeding." Ch. 98-113, § 1, Laws of Fla. It added similar text to section 766.304: "The administrative law judge has exclusive jurisdiction to determine whether a claim filed under this act is compensable." *Id.* § 2. New text also precluded any civil action from being filed until the ALJ made that determination and precluded a civil action from ever being filed if the ALJ determines "the claimant is entitled to compensation." *Id.* Shands, UF, and NICA also point to the supreme court's treatment of the statute in *Bennett v. Saint Vincent's Medical Center, Inc.*, as some sort of validation of the view that *McKaughan* has been abrogated by the amendments. The continued viability of *McKaughan* is central to the question whether the supreme court has given its approval to this outsourcing of judicial power to the executive branch. I take a moment, then, to address the effect of the 1998 amendments and the supreme court's decision in *Bennett*.

IV

A

In *McKaughan*, the parents had filed a medical malpractice suit against providers for injuries their child suffered during childbirth, allegedly because of the providers' negligence. The providers asserted as an affirmative defense that the suit was barred by statutory provisions making the Plan the exclusive administrative remedy for infants who suffer BRNIs. The circuit court referred the affirmative defense to DOAH and stayed the suit until DOAH determined whether the infant suffered a BRNI compensable under the Plan. As ordered, the parents filed a petition for benefits under the Plan, but later they filed a supplemental petition asserting that their infant had *not* suffered a compensable BRNI. They asked, in the supplement, that the case be returned to the circuit court.

The ALJ dismissed the petition because the parents affirmatively averred no entitlement to compensation. There was no "claim for compensation" submitted for administrative resolution, so no authority for the ALJ to act. On review, the supreme court approved the dismissal and held, in response to a certified question, that the Plan statutes do "not vest exclusive jurisdiction in an administrative hearing officer to determine *if an injury suffered by a newborn infant is covered* by the plan when the plan's provisions are raised as an affirmative defense to a medical malpractice action in circuit court." *McKaughan*, 668 So. 2d at 975 (emphasis supplied).

In answering the question, the supreme court rejected several arguments. First, it rejected the providers' assertion that the use of the word "may" in section 766.302(3), Florida Statutes, (*viz.*: stating that "a claim may be filed by [the injured infant's] legal representative") is permissive and does not exclude a provider from seeking benefits for the infant. *Id.* at 977. The court observed that this subsection three "defines the class of claimants who can seek NICA benefits." *Id.* It also looked at a second statutory provision, section 766.305(1), Florida Statutes, which requires that "[a]ll claims . . . commence" with the filing by the "claimant" of a "petition seeking compensation." *See id.* Taking the sum of this text from the two provisions, the court concluded it was "[c]ommon

13

sense" that only "a legal representative of the injured infant who is affirmatively seeking such benefits" had the right to file a claim for "NICA benefits" in DOAH. *Id.* at 977–78. The healthcare providers had no such right to make a "claim" as a "claimant"; to allow otherwise, the providers in the case could "assert the McKaughans' rights in a manner wholly contrary to their wishes." *Id.* at 978. It went further, noting there is "nothing in the legislative scheme that indicates the legislature did not intend to create a straightforward administrative system to handle claims for compensation filed by persons who assert they are entitled to NICA benefits." *Id.*

Next, the court rejected an argument that the text in a third statutory provision, section 766.304—mandating the hearing officer "hear and determine *all claims*"—meant that the officer had "exclusive jurisdiction to determine the *nature of an infant's injury*." *Id.* (emphases supplied). In rejecting the argument, the court initially looked to a fourth provision, section 766.301(2), which expressly makes the Plan applicable "only to birth-related neurological injuries" (that is, BRNIs); and noted that the parents had already asserted their child did not suffer a BRNI and was not entitled to benefits under the Plan. *Id.* The court also considered the portion of section 766.304 providing that the hearing officer/ALJ may "exercise the full power and authority granted to [her or] him in chapter 120 [the Administrative Procedure Act], as necessary, to carry out the purposes of [sections 766.301 through 766.316]"—that is, of the Plan. *Id.* This statutory text, too, "clearly limits the jurisdiction of the hearing officer to determining the nature of an infant's injury *only* when a claim for benefits under section 766.305(1) is filed alleging that the infant *has* suffered a NICA injury." *Id.* (first emphasis supplied).

Pulling this all together, the reader can see that the supreme court relied on a close textual treatment of the four statutory provisions just mentioned, sections 766.301(2), 766.302(3), 766.304, and 766.305(1)—and its conclusion that these provisions limit the Plan and the ALJ's authority thereunder to "claims" by parents affirmatively seeking compensation—to hold that an administrative hearing officer/ALJ does not have "exclusive jurisdiction . . . to determine the nature of an injury suffered by a new-born infant when a medical malpractice action is filed and a

defendant health care provider raised the exclusive remedy of the NICA plan as an affirmative defense." *McKaughan*, 668 So. 2d at 980.

There is more to this conclusion, though. Be careful not to look past the supreme court's acknowledgement of the applicability of its decision in *Mandico v. Taos Construction, Inc.*, 605 So. 2d 850 (Fla. 1992) to the analysis. *See id.* at 976–77. *Mandico*, as it turns out, revisited the question of whether a circuit court could be prevented by writ of prohibition from proceeding on a negligence suit against the plaintiff's employer (despite the plaintiff's having already received worker's compensation benefits under an insurance policy secured by that employer) after the circuit court has denied a summary judgment motion asserting immunity under section 440.11, Florida Statutes. The supreme court responded in the negative, relying on a prior observation it had made that, in Florida, "circuit courts are superior courts of general jurisdiction, and nothing is intended to be outside their jurisdiction except that which *clearly* and *specially* appears so to be." *Mandico*, 605 So. 2d at 854 (quoting *English v. McCrary*, 348 So. 2d 293, 298 (Fla. 1977)). The court held that

> prohibition may not be used to divest a lower tribunal of jurisdiction to hear and determine the question of its own jurisdiction; nor may it be used to test the correctness of a lower tribunal's ruling on jurisdiction where the existence of jurisdiction depends on controverted facts that the inferior tribunal has jurisdiction to determine.

*Id.* Because there is "a right to file a personal injury action in circuit court, and the court has jurisdiction to entertain the suit," it "is an affirmative defense" to that suit to assert that the "workers' compensation law" provides the plaintiff an "exclusive remedy." *Id.* Moreover, the "validity" of that affirmative defense "can only be determined in the course of litigation," a determination that oftentimes will "turn upon the facts," such that the circuit court "has jurisdiction to decide the question even if it is wrong." *Id.*

Notably, *Mandico*'s holding about the circuit court's jurisdiction was not based on the statutory text but on the reach of the court's judicial power. Indeed, the court quoted its earlier

15

decision in *English v. McCrary*, in which it had looked to the broad jurisdiction granted to the circuit court by the Florida Constitution in distinguishing between a court's exceeding its vested authority and its erroneous exercise of jurisdiction. *English*, 348 So. 2d at 298.[6] This recognition of the breadth of a circuit court's jurisdiction led the court to the conclusion that

> [e]very court has judicial power to hear and determine the question of its own jurisdiction, both as to parties and as to subject matter, and necessarily does so by proceeding in the cause. . . . The [circuit court] may receive testimony on a preliminary question to determine its jurisdiction, and is not bound to dismiss the suit on a mere allegation of lack of jurisdiction, but may inquire into the correctness of the averment. . . . A Court having jurisdiction to decide as to its own jurisdiction in any particular case, it follows that its decision will have the

---

[6] *Cf.* Art. V, § 5(b), Fla. Const. ("The circuit courts shall have *original* jurisdiction *not vested in the county courts*, and jurisdiction of appeals when provided by general law." (emphases supplied)); *Ex parte Henderson*, 6 Fla. 279, 291–92 (1855) (remarking that "the Circuit Courts of the State perform the office and discharge the functions of the Court of King's Bench of England," and its "[i]ts jurisdiction is very bright and transcendent" (quoting 3 BLACKSTONE'S COMMENTARIES 42)); *Chapman v. Reddick*, 25 So. 673, 676 (Fla. 1899) ("The circuit courts of this state are superior courts of general jurisdiction, and it requires no citation of authority to show that nothing is intended to be out of the jurisdiction of a superior court, except that which specially appears so to be."); *State ex rel. B. F. Goodrich Co. v. Trammell*, 192 So. 175, 177 (Fla. 1939) ("The circuit courts of the State of Florida are courts of general jurisdiction—similar to the Court of King's Bench in England—clothed with most generous powers under the Constitution, *which are beyond the competency of the legislature to curtail*. They are superior courts of general jurisdiction [such] that nothing is outside [their jurisdiction] except that which is clearly vested in other courts or tribunals . . . by the Constitution and the statutes enacted pursuant thereto." (emphasis supplied) (internal citation omitted)).

16

same effect and conclusiveness as would its decision on any other matter within its jurisdiction; and where the jurisdiction of a court depends on a fact which it is required to ascertain, *its judgment determining that such fact does or does not exist is conclusive on the question of jurisdiction, until set aside or reversed by direct proceedings.*

*Id.* (emphasis supplied) (internal citations and quotations omitted).

B

Following this well-established principle, it must be emphasized that the Legislature could not have divested the circuit courts of jurisdiction to determine their own jurisdiction over medical malpractice suits, even where the NICA exclusive remedy is asserted as an affirmative defense, so the 1998 amendments should not be read as attempting to do so.[7] Indeed, the 1998 amendments, remarkably, left untouched the exact text on which the *McKaughan* Court relied for its holding: all four provisions (sections 766.301(2), 766.302(3), 766.304, and 766.305(1)) limiting the Plan's application to claims *for* compensation based on a BRNI. For instance, the addition to section 766.301(1)(d) refers to a *BRNI* claim and the issue of whether it is covered under the Plan, which "must be determined exclusively in an administrative proceeding." The addition to section 766.304 also speaks in terms of "a *claim filed* under this act" and a determination of whether "the *claimant* is entitled to compensation" under the Plan. (emphases supplied).

These modifications speak to the ALJ's jurisdiction, to be sure, but none of them alters the Plan's limitation to BRNIs and petitions by *claimants* asserting claims for *compensation* under the Plan. Notably, *McKaughan* answered the question of whether an ALJ had exclusive jurisdiction "to determine *the nature of an*

_____

[7] To be sure, I am not suggesting that any of these 1998 amendments are unconstitutional. I simply favor a close textual treatment of those amendments within the context of what otherwise would be constitutionally permissible.

17

*infant's injury*," not whether the ALJ had exclusive jurisdiction to consider a claim under the Plan. *McKaughan*, 668 So. 2d at 978 (emphasis supplied). The 1998 amendments do not speak to this broader, extra-Plan determination either. Or, if that were the intent, the plain meaning of the text that was added—consistently speaking in terms of "claims," which the supreme court already had defined—does not reflect it. In my view, then, *McKaughan*'s core holding—that an ALJ's administrative authority is limited to determining such claims, filed by such claimants affirmatively seeking compensation for a BRNI, as defined by the Plan's provisions—remains unaffected by the 1998 amendments.[8]

---

[8] Impelling this extended analysis is the daunting "red flag" treatment given in Westlaw to *McKaughan*, followed with the statement that the decision has been "Superseded by Statute as Stated in *Florida Birth-Related Neurological Injury Compensation Ass'n v. Florida Div. of Administrative Hearings*," 948 So. 2d 705. But the supreme court did not say this as part of any holding. The court instead simply quoted the Fifth District Court of Appeal's observation in *O'Leary v. Florida Birth-Related Neurological Injury Compensation Ass'n*, 757 So. 2d 624 (Fla. 5th DCA 2000) that the "amendments were made in response to this Court's decisions in *Florida Birth–Related Neurological Injury Compensation Ass'n v. McKaughan,* 668 So.2d 974 (Fla.1996), and *Galen of Florida, Inc. v. Braniff,* 696 So.2d 308 (Fla.1997)." *NICA v. DOAH*, 948 So. 2d at 712–13. Even so, both the Fifth District and the supreme court spoke of the amendments as applying to *claims* under the Plan. *See id.* at 713 ("Specifically, the Fifth District viewed the 1998 amendments as indicating the Legislature's intent to authorize the ALJ to make all determinations *regarding a claim under NICA.*" (emphasis supplied)); *O'Leary v. Fla. Birth-Related Neurological Injury Comp. Ass'n*, 757 So. 2d 624, 627 (Fla. 5th DCA 2000) ("The language used by the legislature in its amendment to the Act indicates that the administrative judge is to determine all matters relative to a claim."); *id.* at 628 ("We also note that a section 766.316 notice issue is peculiar to a NICA claim.").

## C

As just mentioned in the margin, *NICA v. DOAH* cannot be read as recognizing an abrogation of *McKaughan* by the 1998 amendments. Similarly, *Bennett* cannot be read as overruling that decision. First of all, *Bennett* mentioned *McKaughan* but once, and not in the context of the issue being discussed here. Second, even though the parents in *Bennett*—like the *McKaughan* parents—saw their medical malpractice suit abated so DOAH could determine whether their child's injuries qualified as a BRNI, and they were not making a claim in DOAH for compensation under the Plan, the question in *Bennett* did not involve the ALJ's authority, which does not appear to have been raised as an issue.

Instead, before the court in *Bennett* were two other legal questions involving the Plan's text: whether the district court correctly construed the term "immediate postdelivery period in a hospital" as used in the Plan's definition of a BRNI (section 766.302(2)); and whether the district court correctly applied the "rebuttable presumption" provided for in section 766.309(1)(a), Florida Statutes, even though the parents were not making a claim for compensation. *Bennett*, 71 So. 3d at 833–34. *Bennett* nowhere mentions a challenge to the ALJ's authority to consider a "claim" that does not affirmatively seek compensation under the Plan, as that challenge previously had been squarely framed in *McKaughan*. In fact, *Bennett* doubles down on the definition of "claimant" that the *McKaughan* Court utilized: parents *not* seeking compensation under the Plan, but instead "seeking a determination that they [are] not covered by the" Plan, are *not* claimants. *Id.* at 844. That is, a "claimant" under the Plan, even after the 1998 amendments, is still limited to someone affirmatively seeking compensation. And, of course, *McKaughan* holds that the ALJ does not have authority to act officially under the Plan in the absence of a "claim." *McKaughan*, 668 So. 2d at 978.

It is true that the supreme court seems to assume that the ALJ may still consider questions of compensability in the absence of a claim, but the procedural posture of this case is sufficiently different—and the jurisdictional question left entirely untouched—that *Bennett* should not be considered as

19

determinative on the jurisdictional issue examined here. *See Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002) (stating expressly that the court "does not intentionally overrule itself sub silentio" and instructing a lower court that "encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue . . . to apply our express holding in the former decision until such time as this Court recedes from the express holding"). At a minimum, following *McKaughan*'s interpretation of the Plan provisions to delimit the boundaries of an ALJ's authority, the reader could conclude that the ALJ did not have the statutory authority to act on the Chavezes' petition *disclaiming* any entitlement to compensation under the Plan.

The ALJ did nevertheless—by recharacterizing the proceeding as one to determine whether the Chavezes had a "right to sue in a court of law." This likely is how providers generally view the role of the ALJ in these proceedings—to produce an administrative order that will have a preclusive effect on the judicial branch's exercise of its sovereign authority. To take the point further, then, even if the ALJ *could* determine whether G.C.'s injury was a BRNI—absent a claim for compensation—there remains the critical question about what effect an ALJ's order on a "right to sue" could have outside the executive branch. If there could be no real effect outside the executive branch, and no effect on a benefit in favor of Shands and UF within the branch, then how would this court have the authority to consider the appeal by intervenors Shands and UF, given the inability to demonstrate their rights have been adversely affected by the order?

To answer this question—essentially, whether the court has jurisdiction to review the ALJ's order confirming the Chavezes' assertion that the injury does not qualify for compensation under the Plan—one must look at the nature of the authority of an ALJ as an officer of the executive branch vis-à-vis the *sovereign* authority vested in officers of the judicial branch. The premise behind Shands and UF's appeal is that had the ALJ's order gone the other way—determining that G.C.'s injury did qualify as a BRNI—the determination would have preclusive effect in favor of an administrative-exclusivity affirmative defense they might raise in a civil suit for medical malpractice. That is, as Shands and UF seem to see it, if they have in hand an ALJ's order finding a BRNI,

they could block any malpractice suit the Chavezes might bring in circuit court as a matter of law, without the need for any further adjudication by the court.[9] Why else would they be appealing? But this means they in essence are treating the Plan as requiring—or at least authorizing—the judicial branch to delegate to the executive branch its exclusive authority to determine jurisdictional facts related to the providers' exclusivity defense. I noted earlier how Shands and UF characterized the interpretation on which they were relying as "odd." Odd, indeed. The Plan cannot be read this way without violating the Florida Constitution's express separation-of-powers mandate. *See* Art. II, § 3, Fla. Const.

Turn, then, to the limit of the ALJ's authority to determine the nature of the birth-related injury as a conclusive fact controlling a trial court's jurisdiction over a medical malpractice suit. If the order cannot have preclusive effect either way, there is no cognizable harm suffered by Shands or UF—again mere intervenors in the administrative proceeding—and no standing to support invoking this court's authority to directly review the ALJ's order.

V

Executive-branch hearing officers and judicial officers exercise distinct forms of authority. At bottom, a hearing officer can exercise quasi-judicial power, but not judicial power. Only a judicial officer can exercise the State's judicial power (read: sovereign power), and that power cannot be delegated beyond the judicial branch.

A

On the one hand, administrative hearing officers—such as ALJs and judges of compensation claims[10]—are members of the

---

[9] An ALJ's order determining that a claim affirmatively seeking compensation under the Plan is *not* compensable cannot have preclusive effect, by operation of statute (if nothing else). *See* § 766.304, Fla. Stat.

[10] *See* §§ 440.33, 440.45, Fla. Stat.

executive branch, *not* the judicial branch, a distinction the supreme court has "repeatedly acknowledged." *Cf. Jones v. Chiles*, 638 So. 2d 48, 51 (Fla. 1994); *see also Canney v. Bd. of Pub. Instruction of Alachua Cnty.*, 278 So. 2d 260, 262 (Fla. 1973) (noting that an administrative officer or body "is not a part of the judiciary"). They "are executive branch officials," exercising executive authority. *Jones*, 638 So. 2d at 51–52 (discussing "compensation claims judges" specifically). Moreover, while administrative tribunals perform judicial-like functions, they are not "literally" courts. *Id.* On the other hand, the Florida Constitution vests the State's *sovereign* judicial power in four courts, and only four courts: "in a supreme court, district courts of appeal, circuit courts and county courts." Art. V, § 1, Fla. Const. To be sure, that same constitutional provision allows "commissions established by law" and "administrative officers or bodies" to receive "quasi-judicial power," but only "in matters *connected with the functions of their offices*." Art. V, § 1, Fla. Const. (emphasis supplied).

Still, the Legislature cannot delegate or vest *judicial* power in non-courts, like administrative tribunals or officers. *See McRae v. Robbins*, 9 So. 2d 284, 290–91 (Fla. 1942) (noting that an administrative agency may not receive any substantive "judicial powers"); *Canney*, 278 So. 2d at 262 ("As a general rule administrative agencies have no general judicial powers, notwithstanding they may perform some quasi-judicial duties, and the Legislature may not authorize officers or bodies to exercise powers which are essentially judicial in their nature."); *Broward County v. La Rosa*, 505 So. 2d 422, 423 (Fla. 1987) (noting that the Legislature cannot authorize administrative agencies "to exercise powers that are fundamentally judicial in nature"); *Biltmore Const. Co. v. Fla. Dep't of Gen. Servs.*, 363 So. 2d 851, 854 (Fla. 1st DCA 1978) (noting that "[w]hile an administrative agency may exercise quasi-judicial power when authorized by statute, it may not exercise power which is basically and fundamentally judicial").[11]

---

[11] The U.S. Supreme Court recently amplified this important constitutional point at the federal level, a point it has been making

To grant an administrative agency judicial power would be, in essence, to create a new court and run afoul of Article V, section 1 (quoted in pertinent part above), which "expressly prohibits the creation of any courts not expressly listed therein." *Jones*, 638 So. 2d at 51; *see* Art. V, § 1, Fla. Const. ("No other courts may be established by the state, any political subdivision or any municipality."); *see also La Rosa*, 505 So. 2d at 424 (distinguishing between "judicial and quasi-judicial power" and observing that to allow the Legislature to vest "judicial" power in an administrative agency would be to "vest the legislative branch with the authority to create courts other than the four types that the constitution authorizes," which is prohibited).

B

So what is the "judicial power" exclusively vested in Florida's four types of courts? Put simply, it is the conclusive "[d]isposition of private rights to life, liberty, and property." *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 711 (2015) (Thomas, J., dissenting); *see generally Jarkesy*, 603 U.S. at 109 (describing how, historically, the judicial power extends to determine traditional legal claims regarding private rights, cognizable at common law, power that cannot be "siphon[ed]" away or removed from the courts by the legislative power); *see also* Caleb Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. 559, 567 (2007) (enumerating "three major groupings of core private rights," as "elaborated by William Blackstone" in his Commentaries as "absolute" because men held them "merely as individuals" and not

since the 1800s. *See Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 132 (2024) (highlighting how, historically, Congress could not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty" because "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III" (internal citations and quotations omitted)).

incidental to membership in society: "personal security," "personal liberty," and "private property").

The "prototypical exercise of judicial power" is "the entry of a final, binding judgment *by a court* with broad substantive jurisdiction, on a common law cause of action, when the action neither derives from nor depends upon any agency regulatory regime." *Stern v. Marshall*, 564 U.S. 462, 494 (2011); *see id.* at 484 (explaining that the U.S. Constitution's vesting of judicial power means that "Article III judges in Article III courts" (*i.e.*, "the Judiciary") have sole responsibility and power to decide suits "made of the stuff of the traditional actions at common law tried by the courts at Westminster in 1789" (internal quotations and citations omitted)); *cf. Den ex dem. Murray v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 284 (1855) (explaining that the federal legislative power cannot "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty"); *Crowell v. Benson*, 285 U.S. 22, 51 (1932) (describing a case "of private right" as one "of the liability of one individual to another under the law as defined"); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 51–52 (1989) (explaining that Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury").

It is important to note that a *court*'s final order or judgment has the effect of law, an effect that naturally extends beyond the boundaries of the judicial branch and runs throughout the State. *Comm'n on Ethics v. Sullivan*, 489 So. 2d 10, 13 (Fla. 1986) (highlighting distinguishing feature of "decisions rendered by the courts": "binding unless on review by a superior court reversible error is shown to exist in the decision"); *see also Hewitt v. Helms*, 482 U.S. 755, 761 (1987) ("The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*."); *Ex parte Chesser*, 112 So. 87, 90 (Fla. 1927) (describing a "case" or "cause" as "a judicial proceeding for the determination of a controversy between parties wherein rights are enforced or protected or wrongs are prevented or redressed"); *Malone v. Malone*, 368 So. 3d 1057, 1060 (Fla. 1st DCA 2023)

(Tanenbaum, J., concurring) ("A judgment essentially is a court decree that conclusively adjudicates a factual or legal dispute between parties that touches on their respective rights and remedies vis-à-vis each other. In doing so, the judgment materially alters the legal relationship between the parties forever." (citing cases)); *cf. Sirmans v. Owen*, 100 So. 734, 735 (Fla. 1924) ("A judicial act determines the law applicable and the rights and obligations of parties in relation to past transactions."); *State Rd. Dep't v. Crill*, 128 So. 412, 415 (Fla. 1930) ("Coming now to the decisions of this court, we find that a final judgment is one that adjudicates the *merits of the cause and disposes of the action*; that puts an end to the *suit*." (internal citations omitted)); *id.* at 414 (explaining that "a final judgment, order, or decree" of a court "is one that puts an end to the action or cause . . . determines the merits of the controversy or the rights of the parties and leaves nothing for future determination"); *Hillsboro Plantation v. Plunkett*, 55 So. 2d 534, 536 (Fla. 1951) ("A judgment is 'final' for the purposes of an appeal when it terminates a litigation between the parties on the merits of the case and leaves nothing to be done but to enforce by execution what has been determined."); *Gordon v. Gordon*, 59 So. 2d 40, 43 (Fla. 1952) ("We have held as a general proposition that when a final decree or judgment of a court of competent jurisdiction becomes absolute it puts at rest and entombs in eternal quiescence every justiciable, as well as every actually adjudicated, issue.").

Contrast this with *quasi*-judicial power, a power exercised and having effect only *within* the executive branch. That is, quasi-judicial power has no self-executing authority—no legal effect—beyond the confines of the agency within which the power is exercised. It cannot, for instance, have final, preclusive effect on the rights between private parties, without subsequent court action, lest it become the exercise of judicial power by the executive branch itself. *Cf. Wellness Intern.*, 575 U.S. at 713 (Thomas, J., dissenting) (explaining that the "exercise of judicial power," rather than quasi-judicial power, "is required 'when the government want[s] to act authoritatively upon core private rights that had vested in a particular individual'" (quoting Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 569)).

The product of this administrative power, moreover, must be tied to some statutorily authorized government action. As highlighted above, Article V, section 1 of the Florida Constitution limits this power to "matters connected with the functions of" the administrative officer's or agency's office. Unlike "constitutional courts" (*i.e.*, those vested by the constitution with sovereign judicial power), tribunals created to receive this quasi-judicial power by the legislative power "in the exertion of other powers are called legislative courts," and "[t]heir functions always are directed to the execution of one or more of such powers." *Ex parte Bakelite Corp.*, 279 U.S. 438, 449 (1929). It may be exercised by those in the executive branch "who are required to investigate facts, or ascertain the existence of facts, hold hearings, and draw conclusions from them, *as a basis for their official action,* and to exercise discretion of a judicial nature." *Sullivan*, 489 So. 2d at 13; *see also S. Atl. S.S. Co. of Delaware v. Tutson*, 190 So. 675, 680 (Fla. 1939) (distinguishing "*quasi*-judicial" power as that "involving *official* judgment . . . exercised by administrative officers with appropriate statutory authority and limitations in order to *effectuate* duly authorized [governmental] *administrative functions*" (all but first emphasis supplied)); *La Rosa*, 505 So. 2d at 423 ("An administrative agency conducts a quasi-judicial proceeding in order to investigate and ascertain the existence of facts, hold hearings, and draw conclusions from those hearings as a basis for their official actions.").

The exercise of quasi-judicial power by administrative tribunals, at the election of the Legislature, may be used in conjunction with the determination of public rights. *Jarkesy*, 603 U.S. at 109, 120, 127−30 (describing the "public rights" exception to "Article III jurisdiction," which allows Congress to "assign certain matters to agencies for adjudication" when they concern "distinctive areas involving governmental prerogatives," like the "granting of public benefits such as payments to veterans"). Public rights are "rights *of the public*—that is, rights pertaining to claims brought by or against" the government. *Granfinanciera, S.A.*, 492 U.S. at 68 (Scalia, J., concurring); *see also Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (characterizing matters of public rights as those that "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of

the executive or legislative departments"). "[W]hat makes a right 'public' rather than private is that the right is integrally related to particular [government] action." *Stern*, 564 U.S. at 490–91; *see also id.* at 492 (explaining that "[i]f a statutory right is not closely intertwined with a federal regulatory program Congress has power to enact, and if that right neither belongs to nor exists against the Federal Government, then it must be adjudicated by an Article III court" (internal quotation and citation omitted)).

"Conspicuous among such matters are claims against the government," and they "may arise in many ways and may be for money, lands, or other things." *Bakelite Corp.*, 279 U.S. at 452; *see* Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 582 (explaining that "while Congress could waive the government's sovereign immunity and provide for judicial resolution of such claims, it could also handle the claims entirely by itself or through executive agencies acting pursuant to congressional delegation. But this arrangement was possible only because, according to the traditional view, claims against the public treasury 'do not require judicial determination'"). These public claims "all admit of legislative or executive determination, [and] yet from their nature are susceptible of determination by courts; but no court can have cognizance of them except as [the legislative power] makes specific provision therefor." *Bakelite Corp.*, 279 U.S. at 452.

Because the government is immune to suit, it "cannot be sued, except with its own consent. It can declare in what court it may be sued" and "restrict the jurisdiction of the court to a consideration of only certain classes of claims against" it. *McElrath v. United States*, 102 U.S. 426, 440 (1880); *see also id.* ("If the claimant avails himself of the privilege thus granted, he must do so subject to the conditions annexed by the government to the exercise of the privilege."). That is, when the legislative power waives sovereign immunity to allow for the determination of claims against the government, "[t]he mode of determining matters of this class is completely within [legislative] control," meaning the legislative power can "reserve to itself the power to decide, may delegate that power to executive officers, or may commit it to judicial tribunals." *Bakelite Corp.*, 279 U.S. at 451; *see also Oil States Energy Servs., LLC*, 584 U.S. at 334 (noting the "significant latitude" given by

27

precedent to the legislative power "to assign adjudication of public rights to entities other than Article III courts"). There, then, is no right to pursue an adjudication of a claim against the government except under the conditions the legislative power may attach to its consent, as it deems proper—conditions that may include a requirement "that the suit[] be brought in a legislative court specially created to consider them." *Bakelite Corp.*, 279 U.S. at 452; *cf.* Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 627 n.89 (describing nineteenth-century federal claims process by which a legislative court known as the Court of Claims could "enter 'final judgments'" that operated directly against the treasury); *Bakelite Corp.*, 279 U.S. at 451 (noting how these legislative courts may operate as "special tribunals to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it").

The reader, then, can see that administrative fact-finding that will be binding on the parties is permissible "in only those situations involving 'public rights,' e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights." *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442, 458 (1977); *see* Nelson, *Adjudication in the Political Branches*, 107 COLUM. L. REV. at 577 (describing how, historically, when "only public rights were at stake and no private individual had yet acquired any vested right," there was no constitutional need for judicial power, and "Congress could authorize nonjudicial officers in the executive branch to make final and conclusive determinations-- determinations that had legal consequences and that both state and federal courts would have to accept in later litigation"). The fact-finding by an administrative hearing officer can have preclusive effect—and thus retain its character as a completed exercise of quasi-judicial power—*only* within the executive branch as part of its performance of a government function assigned to it by the Legislature.

## VI

Next is an application of these principles behind the separation of quasi-judicial power and judicial power to the Plan and this case.

### A

The Plan establishes a public right and a process by which to adjudicate claims for enforcement of that right. The Legislature established a fund with treasury dollars and created a public right to compensation from that fund for those infants suffering "a limited class of" statutorily defined, "catastrophic" BRNIs. §§ 766.301(2), 766.302(2), (3), 766.303(1), 766.305, Fla. Stat. This right is in favor of "the injured infant" to "promote[] and protect[] the health and best interests of children with birth-related neurological injuries." §§ 766.302(3), 766.303(4), Fla. Stat. The right is enforceable against NICA, which is responsible for administering the Plan and paying awards out of the treasury funds available for that purpose. §§ 766.303(1), 766.315(4), (5)(a), Fla. Stat.; *cf.* § 766.307(2), Fla. Stat. ("The parties to the hearing shall include the claimant and the association."); § 766.311(2), Fla. Stat. (providing that NICA is not "required to make payment of the award" while it is on appeal). There are no other public rights provided under the Plan. Indeed, the Legislature has waived sovereign immunity "solely to the extent necessary to assure payment of compensation" under the Plan. § 766.303(3), Fla. Stat.[12]

The Legislature conditioned this waiver on funneling "[a]ll claims for compensation under the plan" to DOAH—giving ALJs (rather than judicial officers) the exclusive authority to determine whether a claimant asserting a public right to compensation in fact meets the statutory criteria for enforcement of that right. §§ 766.304, 766.305(1), Fla. Stat.; *see* § 766.31(1), Fla. Stat. ("Upon

---

[12] Notably absent is any mention of immunity or some other competing public right in favor of healthcare providers. This absence of any public right in the hands of Shands or UF is key to the conclusion that neither can demonstrate cognizable harm that would give them standing to take an appeal.

determining that an infant has sustained a birth-related neurological injury and that obstetrical services were delivered by a participating physician at the birth, the administrative law judge shall make an award providing compensation for the following items relative to such injury. . . .").[13] In the event of *controverted facts* associated with the claim, the ALJ has the authority to conduct a formal evidentiary hearing and make findings of fact and conclusions of law bearing on that claim. *See* § 766.304, Fla. Stat. (providing the ALJ "the full power and authority granted" by chapter 120); § 766.309(1), Fla. Stat. (requiring the ALJ to make "determinations based upon all available evidence"); *but cf.* § 766.305(7), Fla. Stat. ("Any claim which the association determines to be compensable may be accepted for compensation, provided that the acceptance is approved by the administrative law judge to whom the claim for compensation is assigned.").[14]

There is no doubt that under this process, while determining a claim *affirmatively seeking compensation* from the Plan, the ALJ is conducting "a quasi-judicial proceeding in order to investigate and ascertain the existence of facts, hold hearings, and draw conclusions from those hearings as a basis for" taking official action regarding compensation under the Plan. *La Rosa*, 505 So. 2d at 423; *cf. De Groot v. Sheffield*, 95 So. 2d 912, 915 (Fla. 1957)

---

[13] The analysis here is unaffected by the fact that Shands and UF enjoy sovereign immunity as "state agencies or subdivisions," because the Legislature separately has waived that immunity for law actions to recover money damages in tort for personal injury or death as a result of negligence. *See* § 768.28(1), (2), Fla. Stat.; § 1004.41(5)(d), Fla. Stat.; *but cf.* § 768.28(5)(a), Fla. Stat. (limiting the immunity waiver to liability for payment on any claim or judgment not to exceed $200,000 for any one person, unless there is "further act of the Legislature").

[14] As mentioned earlier, if the ALJ determines the claim to be compensable, he or she also has legislative authorization to determine any dispute over whether statutorily compliant notice was given, such proper notice being a prerequisite for the public benefit awarded by the ALJ under the Plan to be deemed the exclusive remedy. *Cf.* § 766.309(1)(d), Fla. Stat.

(distinguishing a "judicial or quasi-judicial" determination from a "purely executive" one based on a requirement of "notice and a hearing" and an administrative judgment's being "contingent on a showing made at the hearing"); *id.* (characterizing a proceeding as "quasi-judicial" because the administrative board "arrived at its decision after a full hearing pursuant to notice based on evidence submitted in accordance with the statute here involved").

B

In this case, though, there was no claim of a right to public funds, no live controversy over a claimed entitlement to official action authorized by statute. Once the Chavezes filed their amended petition *disclaiming* any entitlement to compensation, they in essence *withdrew* their assertion of a public right, and the ALJ lost authority to proceed further. *Cf. Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 184 (Fla. 1983) (noting that the administrative hearing officer was "vested only with certain limited quasi-judicial powers relating to the adjudication of claims for compensation and benefits," and "[w]hile he may have full power and authority to hear and determine questions pertaining to compensation and benefits, such authority must be exercised *only in respect to such claims*" (emphasis supplied) (internal citations and quotations omitted)); *Humana of Fla., Inc. v. Dep't of Health & Rehab. Servs.*, 500 So. 2d 186, 187 (Fla. 1st DCA 1986) (observing that withdrawal of a petition seeking relief "divested the agency of jurisdiction to proceed").

The Chavezes asserted that the infant had not suffered a BRNI and had no basis for entitlement to compensation under the Plan. There was no claim under the Plan—so no dispute regarding Plan compensation—to be determined. Missing, then, was a government function under the Plan on which a fact determination by the ALJ depended. In fact, the ALJ expressly acknowledged in his order that the Chavezes were "not seeking compensation under the Plan." The ALJ saw the purpose of the proceeding as determining something beside the public benefit specified under the Plan. According to his order, the proceeding was "to establish the [Chavezes'] right to sue in a court of law," and now NICA, Shands, and UF bore the burden of proving that the Chavezes did *not* have such a right to sue.

The intervention by Shands and UF could not have effected a reanimation of the moribund controversy before the ALJ. Their "rights" as intervenors were "conditional in that they exist[ed] only so long as the litigation continue[d] between the parties"—the Chavezes and NICA. *Envtl. Confederation of Sw. Fla., Inc. v. IMC Phosphates, Inc.*, 857 So. 2d 207, 211 (Fla. 1st DCA 2003). Under the Plan, any real controversy is going to be between the claimant and the Plan. The providers do not have a formal, statutory status in the quasi-judicial proceedings. Meaning, the ALJ cannot utilize DOAH procedural rules to create a substantive party status through allowing intervention.

When the dispute between the Chavezes and NICA ended with the Chavezes' disclaimer of entitlement to a public right to compensation, the claim was terminated, and Shands and UF were foreclosed from trying to further address it. *See id.* (holding that a party's dismissal of his or her claim "will generally foreclose the rights of an intervenor who wished to address that claim"); *see also Humana*, 500 So. 2d at 187–88 (rejecting intervenor's argument "that, having properly intervened in the administrative proceeding, it could not be divested of its rights as a party by the initial petitioner's voluntary dismissal of the hearing," and instead explaining that an intervenor "joined the proceeding subject to the action of the original petitioner" so that a dismissal by the original petition left "no valid proceeding [] in which [the intervenor] could participate"); *Envtl. Confederation of Sw. Fla., Inc.*, 857 So. 2d at 210 (explaining that "the rights of an intervenor are subordinate to the rights of the parties," even in an administrative proceeding, and "that an intervenor may not inject a new issue into the case"). In this context, an ALJ's determination whether someone has a "right to sue"—absent a claim for a public benefit—could have no effect outside the executive branch.

Section 766.304 (providing that the ALJ "has exclusive jurisdiction to determine" the compensability of a *claim* under NICA) and section 766.309 (giving the ALJ "exclusive jurisdiction" to make certain "factual determinations"), then, did not change the claim's status as terminated (it having been withdrawn), nor the intervenors' status as divested of any entitlement to proceed (there no longer being a claim for them to dispute). Recall that DOAH is part of the executive branch, and an ALJ is not a judicial officer.

32

The Legislature can give only quasi-judicial power to DOAH, an ALJ, or another executive hearing officer, which Article V, section 1 of the Florida Constitution confines to determinations of fact integral to some government function or action the Legislature assigns. *See La Rosa*, 505 So. 2d at 423; *cf. Stern*, 564 U.S. at 490–91 (noting that "what makes a right 'public' rather than private is that the right is integrally related to particular [government] action").

An ALJ's *quasi*-judicial power under the Plan here, then, is derivative of, and requires—as a condition precedent for its exercise—a government function associated with it. Without a "claim" affirmatively seeking compensation under the Plan, though, there was no such government function requiring the ALJ's exercise of that power. The "exclusive jurisdiction" provisions in sections 766.304 and 766.309 simply cannot operate to give the ALJ authority independently—outside the context of a claim under the Plan—to decide conclusively the nature of G.C.'s injury in the way advanced by Shands and UF. And, as already discussed, the plain text added in 1998 does not suggest otherwise. Bottom line: When the Chavezes effectively withdrew their claim under the Plan, Shands and UF had no statutory basis for proceeding as intervenors before the ALJ in a quasi-judicial capacity. As intervenors, they merely sought an answer to an idle question, an answer that would have no effect on their rights one way or the other.

C

1

The continued pursuit by Shands and UF of a determination regarding the nature of the injury suffered by the Chavezes' child—as intervenors, in the absence of a disputed "claim"—turned the proceeding into one, as the ALJ put it, about whether the Chavezes could sue. Regardless of whether the ALJ had the authority to move forward with such a determination, the Legislature cannot vest sovereign judicial power (*i.e.*, the power to make an adjudication of the respective rights of private parties having the force of law) in an ALJ or any other entity within the executive branch. Yet, the intervenors' request that the ALJ address whether the injury qualified as a BRNI, even without a

claim under the Plan, essentially is the invocation of this very same judicial power that, as already explained, the ALJ clearly cannot possess.

Again, whether G.C.'s injury fit the definition of a BRNI could have been relevant only to the circuit court's jurisdiction over the Chavezes' anticipated medical malpractice suit in the face of an exclusivity affirmative defense. *See McKaughan*, 668 So. 2d at 976, 979 (characterizing affirmative defense of NICA exclusivity as a jurisdictional bar to medical malpractice action and applicability of *Mandico* to analysis); *cf. Mandico*, 605 So. 2d at 854 ("The assertion that the plaintiff's exclusive remedy is under the workers' compensation law is an affirmative defense, and its validity can only be determined in the course of litigation."). And as explained below, only judicial power could operate *conclusively* on the determination of that jurisdictional fact, meaning the ALJ's order must be treated as advisory, non-final, and non-binding, lest it be an impermissible administrative exercise of the judicial power.

2

The Chavezes and their child each have a constitutional right to access the courts to seek remedies against Shands and UF based on their respective private rights of action for medical malpractice. Art. I, § 21, Fla. Const. ("The courts shall be open to every person for redress of any injury . . . ."); *see Psychiatric Assocs. v. Siegel*, 610 So. 2d 419, 424 (Fla. 1992) (recognizing that "[t]he right to go to court to resolve our disputes is one of our fundamental rights" and remarking that the right is to be construed "liberally in order to guarantee broad accessibility to the courts for resolving disputes" and to ensure "the litigant a forum in which to be heard"). That right itself is personal to them; it is not a public right. *See Spafford v. Brevard County*, 110 So. 451, 454 (Fla. 1926) (observing that the access-to-courts guarantee in the Declaration of Rights, among other rights enumerated therein, secures an "individual right[] against unconstitutional invasion by the state, as well as from violation by other governmental agencies and

34

individuals"). [15] The Chavezes' claim for damages on behalf of their infant fits within the constitutional right of access as a private, "state common law" one that "does not depend upon the will of" the Legislature. *Stern*, 564 U.S. at 493; *see Maggio v. Fla. Dep't of Lab. & Emp. Sec.*, 899 So. 2d 1074, 1081 n.5 (Fla. 2005) (noting that "medical malpractice actions existed as common law torts and thus were covered under the general waiver of sovereign immunity in section 768.28[]"). [16]

I observed earlier that there is a difference between a determination of a BRNI *claim* for compensation and a determination of the nature of a birth-related injury on which a medical malpractice suit is premised. The former is an adjudication necessary to enforce a public right and constitutes the exercise of quasi-judicial power. The latter is an adjudication of a

---

[15] The Plan here is a carve-out from the broader right to court access. *See Bennett*, 71 So. 3d at 833 (describing Plan as "eliminat[ing] and replac[ing]" the "parents' common law rights to sue on behalf of their children for medical malpractice" with "an administrative remedy"); *id.* at 838 (pointing out "important principle" that "the NICA Plan limits the remedies as a statutory substitute for common law rights and liabilities").

[16] As noted earlier, if, however, the Chavezes thought their child suffered a BRNI—which they originally did—and otherwise qualified under the Plan for public compensation, they had a right to pursue that compensation, but they had to do it through DOAH. Any award they accepted out of the NICA fund would have been their exclusive remedy on behalf of their child. The Plan's exclusivity of remedy for "birth-related neurological injury claims" of course is a derogation of that personal right to sue. *See McKaughan*, 668 So. 2d at 979 n.3 (acknowledging implication of citizens' constitutional entitlement to "access to the courts"); *cf. Kluger v. White*, 281 So. 2d 1, 4 (Fla. 1973) (holding that "where a right of access to the courts for redress for a particular injury . . . has become a part of the common law of the State . . . the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries").

fact on which the circuit court's authority to render judgment on a private right of action turns. Absent a claim for compensation from the Chavezes, this latter factual adjudication becomes one of constitutional import: If an infant's injury does satisfy the definition, then the constitutionally guaranteed access to courts for a tort remedy is barred; if not, then the right to sue in court for malpractice remains.

A boundary-line fact like this—one determinative of a constitutional right or a court's jurisdiction—can be adjudicated conclusively only by an Article V trial court through the exercise of its vested judicial power. *See Mandico*, 605 So. 2d at 854 (noting, in the context of workers' compensation immunity (but, according to the supreme court, applicable in the NICA context as well) that "[t]he court has jurisdiction to decide the question [of exclusivity] even if it is wrong," and that "the decision will often turn upon the facts"); *see also English*, 348 So. 2d at 298 (explaining how "[e]very court has judicial power to hear and determine the question of its own jurisdiction, both as to parties and as to subject matter" and its judgment on that fact will be conclusive unless set aside on direct appeal); *cf. Crowell*, 285 U.S. at 64 (holding that "the essential independence of the exercise of the judicial power of the United States, in the enforcement of constitutional rights requires that the federal court should determine such an issue upon its own record and the facts elicited before it"); *id.* (noting that on a question of "constitutional authority of the deputy commissioner as an administrative agency, the court is under no obligation to give weight to his proceedings pending the determination of that question" and may instead make its own determination of the facts bearing thereon).

The quasi-judicial power of the executive branch cannot reach the adjudication of that fact in the same, conclusive (or preclusive) way.[17] *See Crowell*, 285 U.S. at 61–62 (construing a statute authorizing the exercise of quasi-judicial power to allow for *non-final* determinations of "jurisdictional fact" to render it constitutional); *id.* at 60 (holding that there is an entitlement "to a

---

[17] By "conclusive" or "preclusive," I mean final and determinative, requiring no further proof.

36

judicial determination" by a trial court "of an essential jurisdictional fact both in the statutory and the constitutional sense" (internal quotations and citation omitted)); *see also Atlas Roofing Co., Inc.*, 430 U.S. at 450 n.7 (observing that "[i]n cases which do involve only 'private rights,' this Court has accepted factfinding by an administrative agency, without intervention by a jury, only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master"); *Stern*, 564 U.S. at 490 n.6 (observing that an administrative tribunal may make "narrowly confined factual determinations" on which private rights might turn as long as the determinations are subject to judicial review and enforceable "only by action of" a court exercising judicial power, such that the tribunal "functioned as a true 'adjunct' of the" trial court). This leads inexorably to the conclusion that the ALJ's order here could have no preclusive or final effect—regarding whether G.C.'s injury was a BRNI—outside (or even inside) the executive branch, certainly not where the order is unmoored from the performance of any legislatively assigned governmental function.

3

The argument from Shands and UF in favor of this court's jurisdiction seems to be premised on reading the Plan (especially the 1998 amendments) as codifying the procedure mentioned in *McKaughan* and *Bennett*, whereby the circuit court abated the malpractice suit and transferred to DOAH the exclusivity-BRNI-affirmative defense for adjudication. In other words, they seem to presume the Plan now requires a circuit court to outsource to an ALJ the determination of the nature of an infant's injury on which the court's jurisdiction might turn. The Legislature, however, cannot do that; it simply cannot "substitute for constitutional courts," in which the State's judicial power is vested, "an administrative agency . . . for the final determination of the existence of the facts upon which the enforcement of the constitutional rights of the citizen depend." *Crowell*, 285 U.S. at 56. To "completely oust the courts of all determinations of fact by vesting the authority to make them with finality in [legislative] instrumentalities or in the executive department . . . would be to sap the judicial power as it exists under" our constitution and "establish a government of a bureaucratic character alien to our

system, wherever fundamental rights depend . . . upon the facts, and finality as to facts becomes in effect finality in law." *Id.* at 57; *cf. State ex rel. B. F. Goodrich Co.*, 192 So. at 177 (noting the generous powers with which circuit courts are vested under the constitution, "*which are beyond the competency of the legislature to curtail*" (emphasis supplied)).

At all events, the idea of having an ALJ make determinations of jurisdictional fact regarding a Plan-exclusivity defense smacks of the doctrine of "primary jurisdiction." Even as an accepted approach, the ALJ's fact determinations at best would have to be advisory, from an expertise perspective. Despite its name, "primary jurisdiction" is not jurisdictional, from the *court's* perspective. *See Flo-Sun, Inc. v. Kirk*, 783 So. 2d 1029, 1041 (Fla. 2001) (explaining that the doctrine "operates to *postpone* judicial consideration of a case to administrative determination of important questions involved by an agency with special competence in the area" (internal quotation and citation omitted)). The doctrine "does not defeat the court's jurisdiction over the case, but coordinates the work of the court and the agency by permitting the agency to rule first and *giving the court the benefit of the agency's views*." *Id.* (emphasis supplied) (citation omitted). Still, the ALJ has no particular expertise in distinguishing among birth-related injuries, so the "experts" available for resolving that question, absent a claim under the Plan, are Florida's courts, "and it is with those courts that [their claim and any defenses] must stay." *Stern*, 564 U.S. at 462.[18]

---

[18] Indeed, the Second District made this same point, from a "primary jurisdiction" perspective, in an opinion approved by the supreme court in *McKaughan*. *See Humana of Fla., Inc. v. McKaughan on Behalf of McKaughan*, 652 So. 2d 852, 860 (Fla. 2d DCA 1995), *approved*, 668 So. 2d 974 (Fla. 1996) (rejecting argument that "primary jurisdiction" required a hearing officer or ALJ, rather than a circuit court, to determine whether an infant's injury fell within the statutory definition of a BRNI for the purpose of deciding the "exclusive administrative remedy" affirmative defense, because "[u]nquestionably, circuit courts have vast experience and competence in adjudicating medical negligence

This leaves the ALJ's order determining that G.C.'s injury is not a BRNI under the Plan as an advisory one. But regardless of how the order came out (Shands and UF of course arguing it should have come out the other way), in the absence of a claim for compensation under the Plan, the order would not be competent to have any preclusive effect.[19] That is the key point here.

## VII

Note that this court's authority to review administrative action stems from the Florida Constitution. See Art. V, § 4(b)(2), Fla. Const. ("District courts of appeal shall have the power of direct review of administrative action, as prescribed by general law."). Contrast this authority with the district court's authority to review final orders of trial courts. *See id.* § 4(b)(1). Unlike with the latter authority, there is no constitutional right to a district court's review under the former authority. The Legislature generally confers that right to "adversely affected" parties in a proceeding under the Administrative Procedure Act ("APA"). *See* § 120.68(1)(a), Fla. Stat. Even though the Plan does not contain a similar statutory standing provision, I doubt one is necessary. When the Legislature authorizes a district court's direct review of administrative action, that authorization still cannot extend beyond the judicial power vested in the court by the constitution. And that power extends no further than to remedy cognizable harm flowing from an order produced by some judicial or quasi-

---

claims and have traditionally and routinely decided complicated medical issues in such cases without the assistance of administrative expertise," and because the "issue to be decided by the circuit court was relatively straightforward").

[19] In fact, if the ALJ's order finding no BRNI had been entered in connection with the Chavezes' original petition (affirmatively seeking compensation), it would have had no preclusive effect in the Chavezes' subsequent civil suit, if they chose to pursue one. *See* § 766.304, Fla. Stat. As it stands here, in the absence of any such claim, the order has no legal effect regarding the enforcement of any public right even between the *parties* before the ALJ—the Chavezes, their child, and NICA. Certainly, it could not have any legal effect as between the Chavezes and the intervenors.

judicial proceeding. *Cf. Gazoombi v. State*, 406 So. 3d 371, 378 (Fla. 1st DCA 2025).

Because there is no constitutional right to this type of appeal, whether the appellant can demonstrate cognizable harm relates to the appellant's standing to bring the appeal in the first instance. This standing requirement is inherent in the grant of authority under section 4(b)(2) and reflects the difference between a trial court's judgment and an administrative order. As explained earlier, a judgment binds the parties that it names and has preclusive effect throughout the State without any further action needing to be taken. By its nature, the judgment permanently alters the legal rights or relationship between the named parties, so an adverse effect to support standing to invoke an appellate court's judicial power is inherent in the judgment. The constitutional right to appeal that judgment is an implicit recognition of this.

Administrative proceedings are different, as are the orders those proceedings produce. One example: under the APA, who is a "party" to such a proceeding is much broader than who can be a party in a judicial proceeding. *See, e.g.*, § 120.52(13)(c), Fla. Stat. (defining a "party" to include "[a]ny other person, including an agency staff member, allowed by the agency to intervene or participate in the proceeding as a party"). There simply are not the same rigorous requirements governing the invoking of quasi-judicial power as there are for invoking the true judicial power of the State—as this case clearly demonstrates. An administrative order does not have preclusive effect outside the executive branch; its effects within the branch are governed by statute.

Participation in an administrative proceeding as a party, then, does not necessarily equate with a final agency order having some adverse effect on the participant's substantive right. Surely, no one would contend the Legislature could authorize a district court to exercise its judicial power to correct an administrative order that is purely advisory within the executive branch. One cannot presume cognizable harm caused a party to an administrative proceeding, stemming from an administrative order, the same way the constitution does for trial court final orders. In the context of administrative appeals to the district

40

courts, standing remains a threshold jurisdictional question that must be addressed before reaching the merits of any argument. *See Gazoombi*, 406 So. 3d at 377–78 (addressing the interplay of a criminal defendant's constitutional right to appeal, this court's jurisdiction to consider the appeal, and the court's duty to dispose of arguments on the merits when no cognizable harm has been shown); *cf. Leonard v. State*, 760 So. 2d 114, 119 (Fla. 2000) (addressing summary affirmances versus dismissals for frivolous criminal appeals).

The Plan's sole public benefit is in the hands of the injured child and the child's parents. There is no mention of immunity for providers like the appellants anywhere in the Plan. The Plan gives providers like Shands and UF no express entitlement to anything. The only "claim" belongs to the child and the parents—to compensation under the Plan. Exclusivity of remedy—which the providers like to call "immunity"—is simply a statutorily driven legal consequence, in the trial court, of an award of compensation out of the executive branch (assuming proper notice previously had been given). In other words, the determination of compensability— or no compensability—impacts only the child's and parents' entitlement to an established public benefit. Only they, and the Plan, stand to suffer the type of cognizable harm that would support invoking this court's judicial power to review the ALJ's order.

That leaves for this putative appeal a dispute between Shands and UF, on the one hand; and the Chavezes, on the other; over a non-binding, statutorily unauthorized factual determination regarding the nature of the infant's injury. There is no injury-in-fact to be remedied by appellate disposition. This court's appellate judicial power, in turn, cannot run to the ALJ's order, because neither Shands nor UF can demonstrate the order is causing them a cognizable harm that this court could effectively remedy by setting the order aside. *See Burnett v. Greene*, 122 So. 570, 575 (Fla. 1929) ("The judicial power of the state extends to all controversies justiciable in their nature and to the parties to which or the property involved in which may be reached by judicial process."); *First Nat. Bank v. Bebinger*, 128 So. 862, 863 (Fla. 1930) (explaining that judicial power is reserved for a claim upon which it "is capable of acting upon" by determining "a controversy

between parties wherein rights are enforced or protected or wrongs prevented or redressed"); *Sarasota-Fruitville Drainage Dist. v. Certain Lands Within Said Dist. Upon Which Drainage Taxes for the Year 1952 Have Not Been Paid*, 80 So. 2d 335, 336 (Fla. 1955) (noting that direct appellate review is available only for "actual controversies" and that judicial power does not include the rendition of "advisory opinions"); *cf. State v. J.P.*, 907 So. 2d 1101, 1113 n.4 (Fla. 2004) (noting that standing, at a "constitutional minimum," requires a concrete, actual or imminent "injury in fact" that can be remedied by the judicial relief sought).

\* \* \*

As I mentioned at the opening, the disposition following rehearing is the same as before—dismissal. So, as the Supreme Court asked in *Stern v. Marshall*, in a slightly different context, "why the fuss?" 564 U.S. at 502. "Is there really a threat to the separation of powers" in how parties, courts, and intervenors have treated ALJ orders under the narrow administrative process set out by the Plan? I respond with a prescient statement from *Stern*, as follows:

> The short but emphatic answer is yes. A statute may no more lawfully chip away at the authority of the Judicial Branch than it may eliminate it entirely. Slight encroachments create new boundaries from which legions of power can seek new territory to capture. Although it may be that it is the obnoxious thing in its mildest and least repulsive form, we cannot overlook the intrusion: illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. We cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush.

*Id.* at 502–03 (internal quotations, citations, and brackets omitted).[20]

Nothing effectively has changed on rehearing—because one panel of this court cannot alone stop what I have described here: the slow but steady erosion of the judicial branch's power in favor of the perceived convenience of executive adjudications within an ever-growing administrative state. It will be up to future Plan claimants to recognize and challenge this diminution. The claimant, after all, is the one who ultimately stands to lose if it continues—for when the constitutionally vested judicial power is diminished and not jealously guarded, a citizen's rights tend not to be far behind.

_____

Christine R. Davis of Davis Appeals, PLLC, Tallahassee; for Appellants.

Stephen Alexander Ecenia and Tana D. Storey of Rutledge Ecenia, P.A., Tallahassee for Appellee Florida Birth-Related Neurological Injury Compensation Association; Kara Rockenbach Link; Link & Rockenbach, P.A., West Palm Beach, for Appellees Jennifer Chavez and Marlon Chavez.

---

[20] This sentiment—against siphoning away of judicial power and giving it to the administrative state—is echoed throughout the Supreme Court's recent decision in *Jarkesy*, a decision cited and quoted at several points above.